Filed 5/1/13  P. v. Lebon CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B239688 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA072347) |
| v. | |
| GARY DEVAUGHN LEBON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathryn A. Solorzano, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Gary Devaughn Labon of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] (count 1); attempted premeditated murder (§§ 664/187, subd. (a)) (count 2); and kidnapping to commit rape (§ 209, subd. (b)(1)) (count 3). In count 1, the jury found that defendant kidnapped the victim and inflicted great bodily injury within the meaning of section 667.61. As to counts 2 and 3, the jury found that he personally inflicted great bodily injury pursuant to section 10222.7, subdivision (b).

The trial court sentenced defendant to a term of life imprisonment plus 30 years in state prison. The sentence consisted of the following: in count 2, a life term for the attempted murder plus a consecutive five-year term for the infliction of great bodily injury in that count; in count 1, a consecutive 25-year term for the forcible rape. In count 3, the trial court stayed the sentence of life imprisonment plus five years for the great bodily injury enhancement pursuant to section 654.

Defendant appeals on the grounds that: (1) the trial court's improper refusal to grant his postverdict request for substitute counsel requires reversal of his convictions; and (2) the trial court's improper refusal to reinstate his pro. per. status for purposes of the motion for new trial and sentencing requires reversal of his convictions.

## FACTS

**Prosecution Evidence**

On September 18, 2009, Brigitte Villarreal was at her home in the City of Hawthorne. At approximately 3:00 a.m., she heard her dog growling and barking while looking out the window. Brigitte looked out her bedroom window and saw a person, who appeared to be a man, on her lawn. The man appeared to be kneeling and hitting the ground or punching something. She also saw the man make another movement, which she later described as a swaying back and forth. She thought that someone was having sex on her lawn. A few seconds later, Villarreal saw the man dragging a body to the corner of her lawn. Villarreal called 911. She was concerned because she heard "noises

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

over and over again, like somebody being punched really loud." After the police arrived, Villarreal went outside and saw a woman in her underwear lying on the lawn.

Hawthorne Police Officers Sean Judd and Ian Elliott responded to the call at Villarreal's home. As Officer Judd approached the address, he saw a bicycle lying on the sidewalk. He then saw defendant fighting with someone farther down the street. Defendant had both of his hands clamped around a person lying beneath him. Defendant saw the officers as they got out of their car, and he ran away. A foot chase ensued, and defendant was captured when he tripped and fell.

Sergeant Shawn Shimino arrived to assist the other officers and saw the officers attempting to subdue defendant. After the officers handcuffed defendant, they rolled him over and saw that his pants were undone, his penis was exposed, and a condom was hanging off the end of his penis. Officer Judd deduced that a rape had possibly occurred. He and another officer sprinted back to Villarreal's address and found the victim, H.T.N. She had numerous injuries and looked "gruesome." She was lying on her back and had no pants on. There was blood on the inside of her thighs and on her underwear. Her sweatshirt was pulled up around her neck. She was completely unresponsive, and Officer Judd was not sure if she was breathing. Paramedics arrived and the victim was taken away. Defendant was taken to the Santa Monica Rape Treatment center in order to make a suspect sexual assault kit.

When H.T.N. arrived at the hospital she was not responsive and her vital signs were not stable. She was put on a breathing machine. She had severe bleeding in her brain, and a tube was placed in the brain. She had significant soft tissue swelling. The anterior part of her left eye was filled with blood, and the lens was dislocated. The left side of her face was filled with air because of the trauma she sustained. There was a significant amount of bruising in the neck area and on the inner thighs. H.T.N. had a shattered maxillary sinus bone and multiple shattered bones in the face. She also had bruising of the lungs. Her most significant problem was the bleeding deep in her brain. When she was admitted to the hospital, she was in a near-coma state.

3

H.T.N. was 69 years old at the time of the attack.[2]  Her son testified that she was able to talk, walk, feed herself, and ride her bike before the attack.  After the attack, H.T.N. lived in a nursing home.  She was unable to speak, walk, or feed herself.  She is fed through a feeding tube.  She cannot sit up.  At the time of trial, H.T.N. was a patient of Dr. Shrikant Tamhane in a skilled nursing facility.  He testified that H.T.N. is bedridden.  She is increasingly contracted, which means that her arms and legs are closing in.  She is paralyzed by the brain trauma she suffered and does not interact.  It appears that she is getting worse over time.

Blood and potential semen samples were analyzed by Mary Keens of the Los Angeles County Sheriff's crime laboratory.  Samples were taken from defendant and his clothing.  Defendant and H.T.N. were both included as "possible contributors" to the DNA types detected in blood samples from defendant's right palm.  It was 23.8 quadrillion times more likely that the sample came from defendant and H.T.N. rather than from defendant and a random person in the population.  Defendant and H.T.N. were both included as possible contributors to the epithelial cells found on defendant's scrotum.  It was 95.9 billion times more likely that the sample came from defendant and H.T.N. than from defendant and some random person.  The bloodstain from defendant's underwear was consistent with two contributors, and a major contributor was consistent with the profile of H.T.N.  Defendant and H.T.N. were also possible contributors to the blood found in defendant's undershirt.  The profile from the bloodstain on defendant's jeans and jacket matched the profile from H.T.N., and defendant was excluded as the source of that profile.  Defendant and H.T.N. were contributors to the samples found on the inside and outside of the condom found on defendant.

---

[2]     In all counts, the jury found "not true" the allegation under section 667.9, subdivision (a) that defendant knew or reasonably should have known that the victim was 65 years of age or older.

4

**Defense Evidence**

Sara Cohen-Hadria examined the swabs taken from defendant's body following the attack and did not detect sperm cells on some swabs taken from defendant. The tests she performs are highly sensitive. She did not test the blood to determine what part of the body the blood came from. Mary Keene testified that no test was done for vaginal fluid on the condom. She could not say if the DNA in the scrotal sample came from blood, epithelial cells, or any other source of material. She could only say that the DNA sample "came back to two people," and she included defendant and the victim in that mixture. There were no genetic markers that could have come from anybody else. The DNA test results for the outside of the condom did not necessarily indicate that the condom was used during an act of sexual penetration.

Mehul Anjaria owns a DNA consulting company. Anjaria examined data and reports from Cohen-Hadria and Keens and noted that no semen was detected on any of the swabs from the victim. No semen was detected on the penile or scrotal swabs taken from defendant. There was a positive test result for blood on the scrotal swabs, but the testing used in forensic laboratories cannot determine what area of the body the blood came from. Blood was detected on the inside and outside of defendant's condom. The DNA test results for the outside of the condom do not necessarily indicate that the condom was used during the act of sexual penetration.

Officer Judd testified that defendant's pants were not down when defendant was running from the police officers. When defendant fell to the ground, Officer Judd saw that defendant's fly was down and his underwear was pulled down under the scrotum, and defendant's penis and scrotum were hanging out. After defendant was detained, Officer Judd noticed a condom lying on the sidewalk. Neither he nor anyone else examined the condom closely while it was still on the ground. Officer Judd did not notice if any of the street lights were not functioning.

Villarreal did not see any other people besides defendant on the night of the crime.

5

## DISCUSSION

## I.  Denial of Postverdict Requests for Substitute Counsel

### A.  *Defendant's Argument*

Defendant asserts the trial court repeatedly failed to grant his posttrial motions to substitute counsel based on an irreconcilable conflict that he alleged existed between himself and his court-appointed counsel, Mr. Huey.  Defendant argues that his convictions must therefore be reversed.

### B.  *Relevant Authority*

A defendant is entitled to bring a posttrial *Marsden*[3] motion either for the purpose of sentencing or to bring a new trial motion.  (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024; *People v. Winbush* (1988) 205 Cal.App.3d 987, 991.)  In ruling on a postconviction *Marsden* motion, "the trial court must apply the same standard it would apply in ruling on a preconviction *Marsden* motion:  substitute counsel should be appointed when, 'in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].'"  (*People v. Johnson* (2009) 47 Cal.4th 668, 673, fn. 2.)

*Marsden* held that "when a defendant seeks to discharge counsel and substitute another attorney on the ground of inadequate representation, the court must allow the defendant to explain the basis for the motion and to relate specific instances of the attorney's deficient performance."  (*People v. Clark* (1992) 3 Cal.4th 41, 102-103, citing *Marsden*, *supra*, 2 Cal.3d 118.)  "After hearing from the defendant, a trial court is within its discretion in denying the motion unless the defendant establishes substantial

---

[3]      *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

6

impairment of his right to counsel. [Citation.] On appeal we review the denial for an abuse of discretion." (*People v. Vera* (2004) 122 Cal.App.4th 970, 979; see also *People v. Jones* (2003) 29 Cal.4th 1229, 1245.)

### C. First **Marsden** *Motion*

#### 1. Proceedings

On the day set for sentencing, October 12, 2011, the trial court stated that defendant had filed a motion for appointment of counsel on October 6, 2011. When the court stated that it appeared defendant was actually requesting advisory counsel, defendant said he wanted an attorney to be "first seat," and defendant would act as advisory counsel. The trial court told defendant that his attorney would be in charge of the case. After a lengthy discussion during which the trial court explained to defendant that he could not participate as cocounsel with an attorney, defendant said he definitely wanted counsel.

The trial court expressed its concerns about defendant's history of interaction with his attorneys, the fact that a new attorney would take time to familiarize himself or herself with the case, and the likelihood that defendant would allow his attorney to be in charge without trying to interfere. Defendant insisted he wanted counsel for a new trial motion and sentencing, and the trial court took the matter under submission until the end of the day. The court stated that if it granted defendant's motion it was its intention to reappoint defendant's former public defender, Mr. Huey, to represent him.

At the subsequent proceeding that day, the trial court informed defendant that if he gave up his self-representation status, his pro. per. privileges would be revoked. The court intended to reappoint the public defender and set the matter for a sentencing hearing. Defendant would not be in control of the case. The trial court told defendant that if he asked to go pro. per. again or asked to have his attorney relieved, the motion would be considered, but the request could very well be denied. Defendant insistently asked the court who would be "the next person up" if the public defender declared a conflict. The court would not answer that question and told defendant that the proceeding was not a forum for defendant to select his attorney, and the first order of

7

business was for defendant to relinquish his self-representation status. Defendant said, several times "I would like a court-appointed attorney." As soon as the trial court said that it accepted defendant's forfeiture of his right to represent himself and that the public defender was appointed to represent defendant, defendant said, "The public defender cannot represent Mr. Labon." He repeatedly stated that there was a conflict of interest. The court immediately held a *Marsden* hearing.

At the *Marsden* hearing, defendant insisted that there was a conflict of interest between him and the public defender's office, but did not explain its nature. He also asserted that there was a conflict of interest between himself and Mr. Huey. He said he had no issue with accepting an attorney outside of the public defender's office. The court ascertained that there had been no *Marsden* motion or hearing before Mr. Huey was relieved the first time. Defendant interrupted the court to continually assert that there was a conflict of interest with the public defender and Mr. Huey. When asked to explain the conflict of interest, defendant merely asserted that "there was a conflict of interest many times" between him and Mr. Huey.[4] The trial court repeatedly asked defendant to be specific as to his complaints. The trial court noted that there was no record of an irreconcilable conflict with Mr. Huey or his office. Finally, defendant claimed he had been misled by Mr. Huey and mentioned certain trial tactics he believed Mr. Huey had either employed or failed to pursue. When asked for his response, Mr. Huey did not know what defendant was referring to, and stated that he never knew the nature of any complaint by defendant when defendant requested to represent himself. He had been

---

[4] The record shows that Mr. Huey represented defendant at his June 8, 2010 preliminary hearing, his June 22, 1010 arraignment, and five subsequent pretrial proceedings. On December 13, 2010, defendant asked to go pro. per. because Mr. Huey and defendant were "at complete opposition in terms of appropriating a professional standard of representation in this matter before the court, and we are at a constant indifference." He asserted that he had been misinformed and had not intended to waive time during a prior proceeding. On December 17, 2010, without holding a *Marsden* hearing and without Mr. Huey being present, the trial court granted defendant's request to represent himself.

investigating the case in the way he believed defendant wanted him to. Mr. Huey had a strategy that he communicated to defendant. Mr. Huey explained some of his strategy for trial. Mr. Huey knew how defendant planned to testify, and Mr. Huey did not believe defendant's self-defense argument was "vital."[5] Defendant said he believed Mr. Huey was working with the prosecution.

The trial court stated that it did not find that the defendant's right to counsel would be substantially impaired at that stage by continuing with representation by Mr. Huey. The court had no evidence that he had provided inadequate representation. Defendant continually interrupted the trial court's ruling and had to be admonished. The trial court found that Mr. Huey had not unduly delayed and was not defensive about the allegations. The trial court did not believe that there was an irreconcilable conflict between counsel and defendant to the degree that the right to effective representation would be impaired, even though defendant was not happy with the appointment.

2. *No Abuse of Discretion*

We believe the trial court conducted a *Marsden* inquiry appropriate to the nature of the postconviction motion made by defendant and did not fail to "factor in the pre-existing conflict between counsel" and defendant when denying the request, as defendant claims. The trial court heard defendant's complaints about Mr. Huey's representation before defendant elected to represent himself and found that they did not reveal an inadequate representation. It is well established that "[a] defendant does not have a right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*People v. Welch* (1999) 20 Cal.4th 701, 728.) Although given ample opportunity to explain his position, defendant did no more than object to some of

---

**5**      Defendant ultimately did not testify. He did, however, present his defense of self-defense during his closing argument before the jury, despite the trial court's continual admonitions to focus on the evidence the jury had heard. Defendant told of being threatened earlier in the evening and implied he thought the victim was a gang member.

9

Mr. Huey's prior tactics and could not provide any example of a genuine conflict of interest, despite repeatedly resorting to this claim.

Moreover, the trial court ascertained, and Mr. Huey confirmed, that there had been no prior *Marsden* hearing. Mr. Huey had no notion of the reason for defendant's desire to represent himself. The allegations against Mr. Huey that defendant belatedly made during the subsequent *Marsden* hearing were thoroughly considered by the trial court, as its ruling demonstrates. "'To the extent there was a credibility question between defendant and counsel at the hearing, the court was "entitled to accept counsel's explanation." [Citation.]' [Citation.]" (*People v. Jones*, *supra*, 29 Cal.4th 1229, 1245.)

Additionally, the fact that there were mere tactical disagreements between defendant and his attorney indicates that there was no irreconcilable conflict. (*People v. Dickey* (2005) 35 Cal.4th 884, 922; *People v. Lucky* (1988) 45 Cal.3d 259, 281–282.) The court will not relieve defense counsel if the defendant manufactures a conflict to force substitution of counsel. (*People v. Smith* (1993) 6 Cal.4th 684, 696-697.) Also, a conflict between defendant and counsel does not constitute an irreconcilable conflict when the defendant has failed to make a good faith effort to work out any disagreements. (see *People v. Smith* (2003) 30 Cal.4th 581, 606; *People v. Barnett* (1998) 17 Cal.4th 1044, 1086.) The record is devoid of any indication that defendant discussed his concerns with Mr. Huey. As noted in *People v. Padilla* (1995) 11 Cal.4th 891, "'There is no constitutional right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant. [Citations.] Nor does a disagreement between defendant and appointed counsel concerning trial tactics necessarily compel the appointment of another attorney. [Citations.]'" (*Id.* at p. 927, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Defendant failed to make an adequate showing that his right to the assistance of counsel was being denied or impaired. In light of all the circumstances, we conclude that the trial court conducted an adequate inquiry into defendant's complaints about his attorney and did not abuse its discretion in denying the *Marsden* motion. (See *People v. Barnett*, *supra*, 17 Cal.4th at p. 1085.)

### D. *Second* **Marsden** *Motion*

#### 1. *Proceedings*

After the trial court declined to relieve Mr. Huey, Mr. Huey represented defendant at proceedings on December 12, 2011, January 25, 2012, and February 22, 2012, the day of sentencing and the second *Marsden* motion.  At the second *Marsden* hearing, defendant reiterated that Mr. Huey believed the prosecution and the police were correct.  Mr. Huey responded, "I don't know where he gets that."  Mr. Huey detailed his efforts in preparing for the new trial motion and did not believe there was anything he failed to do.  Mr. Huey had apprised defendant of his intentions for the new trial motion.  He realized defendant was not satisfied with the issue he had developed, but he denied he was on the side of the prosecution.

Defendant began arguing with the court over the reappointment of Mr. Huey and disparaged the new trial motion that Mr. Huey had prepared.  Defendant reiterated that he did not want Mr. Huey or the public defender's office working for him.

In making its ruling, the trial court told defendant that it did not think he could get along with any appointed attorney.  Defendant was manipulative in that he wanted a trained eye to look at the record and determine whether a legal argument could be made.  Now that it was done, defendant wanted to get rid of the attorney so that he could do all the talking.  The trial court found there was no irreconcilable conflict and that Mr. Huey had not been ineffective.  The *Marsden* motion was denied.

#### 2. *No Abuse of Discretion*

We conclude there was no abuse of discretion.  Defendant's repeated claims of a conflict of interest with the entire public defender's office reveal the chimerical nature of his alleged conflict with Mr. Huey in particular.  Although under *Marsden*, a trial court must afford a defendant the opportunity to state all of his reasons for dissatisfaction with his appointed attorney, "[o]n the other hand, a defendant is not entitled to keep repeating and renewing complaints that the court has already heard." (*People v. Vera*, *supra*, 122 Cal.App.4th at p. 980, citing *People v. Clark*, *supra*, 3 Cal.4th at p. 104.)  ""'[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney

were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.'" [Citation.]" (*People v. Memro* (1995) 11 Cal.4th 786, 857, disapproved on another point in *People v. McKinnon* (2011) 52 Cal.4th 610, 639; *People v. Smith*, *supra*, 30 Cal.4th at p. 606 ["A defendant may not effectively veto an appointment of counsel by claiming a lack of trust in, or inability to get along with, the appointed attorney."].)

Defendant never provided any explanation as to why there was a conflict of interest with the public defender's office. Defendant appears to have believed that a conflict between him and the public defender's office would entitle him to be represented by "the next person up," and he presumably believed that he would then be represented by an attorney who was more akin to privately retained counsel. As stated in *People v. Alexander* (2010) 49 Cal.4th 846, 871, "the Sixth Amendment to the federal Constitution guarantees the right to the assistance of counsel for a defense, but this guarantee 'is subject to an important limitation, however: "[T]he right to counsel of *choice* does not extend to defendants who require counsel to be *appointed* for them." [Citation.]' [Citation.]."

Apart from his accusations that Mr. Huey was working for the prosecution, defendant's complaints about Mr. Huey were over tactics, as previously noted. Defendant complained that Mr. Huey was not doing what defendant asked him to do, confirming the trial court's opinion that it was defendant's goal all along to be in charge of the case. As stated previously, to the extent that defendant's version of his communications with counsel differ from Mr. Huey's, the trial court in its discretion may accept Mr. Huey's version. (*People v. Jones*, *supra*, 29 Cal.4th at p. 1245.) Defendant clearly had never abandoned his purpose of controlling his case, despite his insistence on being represented and despite the trial court's continual admonitions. (See *People v. Welch*, *supra*, 20 Cal.4th at pp. 728-729 [counsel's job to create defense strategy: "'When a defendant chooses to be represented by professional counsel, that counsel is

12

"captain of the ship" and can make all but a few fundamental decisions for the defendant.' [Citation.]"].)

Defendant makes much of Mr. Huey's comment to the court that, "I don't know how long I have to sit here and be impugned in front of a reporter." This occurred after the trial court denied defendant's second *Marsden* motion and the proceedings had continued. Defendant, refusing to admit defeat, kept arguing with the court about Mr. Huey, and the trial court responded to defendant without asking the prosecutor to leave. Mr. Huey next suggested that, since defendant was discussing his representation again, the courtroom should be cleared. This was merely an invocation of the trial court's duty to conduct a *Marsden* inquiry whenever a defendant asserts or implies that his attorney is providing inadequate representation. (*People v. Lara* (2001) 86 Cal.App.4th 139, 150-151.) Considering the content of defendant's complaints and his insistence on continuing to argue with the court about Mr. Huey's representation, Mr. Huey understandably suggested a proper *Marsden* hearing be held. It was not, as defendant alleges, a demonstration that Mr. Huey was placing his interests above those of his client.

*3. Any Error Harmless*

In any event, any error in the denial of the *Marsden* motion was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Defendant has not shown that Mr. Huey's representation had a detrimental effect on the outcome of his case. Defendant represented himself at trial. The evidence of his guilt was overwhelming, especially considering that he was caught at the scene of the brutal attack and rape, and compelling physical evidence, including DNA evidence, linked him to the victim. The trial court had little discretion in sentencing, and Mr. Huey advocated for concurrent sentencing, although to no avail. Defendant has not credibly established that appointment of a different attorney for preparing a new trial motion and for sentencing would have gained defendant a new trial or had any effect on the sentence imposed. (*People v. Washington* (1994) 27 Cal.App.4th 940, 944.)

13

## II. Refusal to Reinstate Pro. Per. Status

### A. Defendant's Argument

Defendant contends that the trial court erred in refusing his request to resume his pro. per. status after he failed to secure new counsel. Defendant asserts that the error requires reversal of his convictions.

### B. Relevant Authority

In order to invoke the constitutional right of self-representation, a defendant must unequivocally assert that right within a reasonable time prior to the trial, or, in this case, the sentencing proceeding. (*People v. Windham* (1977) 19 Cal.3d 121, 127-128.) Motions made after that time are left to the trial court's discretion. (*People v. Valdez* (2004) 32 Cal.4th 73, 103; *People v. Mayfield* (1997) 14 Cal.4th 668, 809; *People v. Horton* (1995) 11 Cal.4th 1068, 1110.) In evaluating the timeliness of a *Faretta* motion,[6] a trial court may also properly consider the delay that would be required if the motion were granted and the uncertainty caused by such delay. (*People v. Lynch* (2010) 50 Cal.4th 693, 728, disapproved on another point in *People v. McKinnon*, *supra*, 52 Cal.4th at p. 639.) The timeliness requirement is intended to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice. (*Lynch*, at p. 722.) If the motion is untimely, the defendant has the burden of justifying the delay. (*Horton*, at p. 1110.)

In exercising its discretion, the trial court should consider the quality of counsel's representation, the defendant's prior efforts to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay reasonably likely to result from granting the motion. (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 810, citing *People v. Windham*, *supra*, 19 Cal.3d at p. 128.)

---

**6**     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

14

### C. Proceedings Below

After the trial court denied the second *Marsden* motion, defendant told the court that Mr. Huey was "fired off the case." The trial court informed defendant that he did not have the capacity to fire Mr. Huey. Defendant insisted that Mr. Huey was no longer representing him. Defendant kept repeating that Mr. Huey was fired and eventually stated that he would represent himself from that point forward. The trial court told defendant that it was not surprised. Defendant had established a pattern of behavior that was exemplified by his closing arguments before the jury, during which the trial court had to admonish him at least 10 times to argue only the evidence. The orders were ignored. The court told defendant he did not have a right to represent himself unless the court had faith that he would represent himself in a nondisruptive manner. The trial court believed the *Faretta* request was for the purpose of disruption and delay. The court noted that the community, the state, and the interested parties had a right to a speedy sentencing as well, and the trial court had already made concessions and expended resources with respect to defendant's request to reappoint counsel. Because the court believed that defendant would do anything possible to delay and obstruct sentencing and disregard the court's orders, it was not inclined to grant defendant's request.

Defendant once again complained that that he had wanted a state attorney appointed and instead the court had brought back Mr. Huey. He accused the trial court of being manipulative in forcing him to take Mr. Huey again. The court pointed out that defendant had not complained about Mr. Huey after the last three appearances, and defendant had never opposed a continuance. Only on the day certain for sentencing had defendant complained. When the trial court asked defendant if he was prepared for the motion for new trial if his *Faretta* motion were granted, defendant said he did not have his motion with him.

The trial court denied the motion. The trial court stated it had absolutely no faith that defendant would conform to the court's orders, and allowing him to represent himself would delay the proceedings and result in a disorderly resolution of the case. Defendant had spoken out over the court many times during the proceedings and raised

15

his voice.  Defendant continued to argue with the court.  The court again denied the motion.

### D.  No Abuse of Discretion

We first observe that defendant's motion was clearly untimely, although defendant appears to assert otherwise.  Defendant cites *People v. Miller*, *supra*, 153 Cal.App.4th 1015, for the proposition that sentencing is a separate and distinct proceeding, different from the trial, and therefore defendant's request for self-representation at sentencing was timely.  (*Id*. at p. 1024.)  The Court of Appeal vacated Miller's sentence after concluding that he had the right to represent himself at sentencing, and the trial court had erred in treating the request as untimely.  (*Id*. at pp. 1024-1025.)

*Miller* states, however, that "This is not to say that every request for self-representation at sentencing will be timely.  Much as a request to represent oneself at trial must be made a reasonable time before trial commences, the request for self-representation at sentencing must be made within a reasonable time prior to commencement of the sentencing hearing."  (*People v. Miller*, *supra*, 153 Cal.App.4th at p. 1024.)  Miller's request to represent himself was made a full two months before his sentencing hearing.  (*Id*. at p. 1019.)  Miller informed the court that the reason for his request was to be able to perform an investigation and related legal research prior to sentencing, which is why he was requesting an immediate ruling on his motion.  (*Id*. at pp. 1019-1020.)  Miller told the court he would be ready on the day scheduled for sentencing.  (*Id*. at p. 1020.)

*Miller* is easily distinguishable from the instant case.  Defendant made his *Faretta* motion on the very day of sentencing.  In addition, he made his *Faretta* motion in an apparent fit of pique immediately after his *Marsden* motion was justifiably denied.  Unlike *Miller*, he presented no cogent reason for his request to represent himself.   "[B]y juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions," the trial court could have reasonably concluded that he was "playing 'the *Faretta* game'" in an effort to delay the trial.  (*People v. Williams* (1990) 220 Cal.App.3d 1165, 1170.)  A defendant's *Faretta* request may be found equivocal when it is made immediately after

the court has rejected the defendant's *Marsden* motion.  (See, e.g., *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205.)

A review of the record reveals that defendant's untimely motion did not pass muster under the *Windham* factors.  A trial court need not explicitly state on the record that it has considered the various *Windham* factors if substantial evidence in the record otherwise supports the inference that the trial court had those factors in mind when it ruled.  (*People v. Scott*, *supra*, 91 Cal.App.4th at p. 1206.)  The trial court's remarks here provide substantial evidence that it had the appropriate factors in mind, and our own consideration of the *Windham* factors supports the trial court's denial of defendant's motion.  (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354-1355.)

Regarding the quality of counsel's representation, we expressed our agreement with the trial court's finding during the *Marsden* motions that there was no evidence Mr. Huey was providing inadequate assistance of counsel.  As the trial court pointed out, defendant had a history of being dissatisfied with the legal representation offered him.  He had asked to represent himself rather than accept representation by the public defender, and he had also had his standby counsel removed.

With respect to the reason for the request for self-representation, the court believed that defendant's actual purpose was to delay the process, and defendant's conduct supports this view.  The only reason defendant gave, apart from the fact that he did not want a public defender, was that he wanted to file a new trial motion.  Previously, defendant had stated he wanted an attorney to prepare a new trial motion, and Mr. Huey had done so.  Although defendant apparently believed there were more issues to raise than found by Mr. Huey, the fact that defendant exploited closing argument to repeatedly argue items outside the evidence casts doubt on the value of any motion written by defendant.  The trial court was well aware of defendant's tendency to stray from legal arguments.

As for the stage of the proceedings, the record shows that sentencing had already been delayed for several months, and further delay was unwarranted.  The verdicts were rendered on August 30, 2011, almost six months before the *Faretta* request.  The trial

17

court had given defendant extra time to prepare for sentencing and a new trial motion and scheduled the sentencing and motion hearing for October 12, 2011. On October 6, 2011, defendant asked for counsel to be appointed. After Mr. Huey was appointed and had represented defendant for over four months, defendant wished to start all over with his own new trial motion and to delay sentencing. As the court observed, the People and the community also had an interest in sentencing within a reasonable time, and the court already had made concessions to defendant's vacillations. The trial court, given defendant's history, which is reflected in the record, was justified in believing that defendant would do everything he could to delay and obstruct sentencing and to disregard the court's orders.

Finally, defendant was not prepared to proceed with his new trial motion, despite undoubtedly being aware that he would ask to represent himself on that day if he were not a given a different attorney. Merely because defendant stated that he did not have the motion "with [him]" does not signify that he had one fully prepared, but had just not brought it to court. The California Supreme Court has held that, in the face of an untimely request, the grant of propria persona status may be conditioned on the defendant's ability to proceed with the trial without a continuance. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1039.)

Furthermore, defendant was increasingly disrespectful to the court as it became clear he would not get his way. The trial court chided him for continually interrupting and raising his voice. Defendant repeatedly accused the court of manipulating the proceedings. He also accused the court of intentionally making a false statement. A defendant who is offensive may forfeit his right of self-representation. (*Faretta*, *supra*, 422 U.S. at pp. 834-835, fn. 46; *People v. Powers* (1967) 256 Cal.App.2d 904, 914-915, disapproved on another point in *People v. Taylor* (2009) 47 Cal.4th 850, 881.) Given defendant's conduct and the other circumstances discussed *ante*, it was not an abuse of discretion for the trial court to deny defendant's request for self-representation during sentencing.

18

Moreover, any error in denying defendant's *Faretta* motions was harmless. Although a trial court's error in denying a timely motion to represent oneself is automatically reversible (*People v. Joseph* (1983) 34 Cal.3d 936, 945-948), when the motion is untimely, we apply the harmless error standard, i.e., whether it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058; *People v. Watson* (1956) 46 Cal.2d 818, 835-836.) "[A] defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel." (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1051-1052, citing *Faretta*, 422 U.S. at p. 834.) Moreover, the only proceedings that remained were sentencing and a possible new trial motion hearing, and the core of the *Faretta* right is the right "'to preserve actual control over the case he [defendant] presents *to the jury*.'" (*Rivers*, at p. 1052, quoting *McKaskel v. Wiggins* (1989) 465 U.S. 168, 178.)

We conclude there would not have been a result more favorable to defendant had he represented himself. As noted previously, the evidence of defendant's guilt was overwhelming, and he was in charge of his own trial. There was very little discretion in sentencing, and defense counsel advocated for a 25-years-to-life sentence "and no more." The trial court disagreed. Defendant's *Faretta* motion was properly denied.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.                                    FERNS, J.*

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.